\UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

    - against -

FNU LNU,
    a/k/a "Ricardo Hernandez,"
    a/k/a "Herbeth Wilfredo Giron Diaz,"

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Filed Electronically

10 Cr. 1043 (KTD)

# SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-1945/2405
Facsimile: (212) 637-2452
E-mail: matthew.schwartz@usdoj.gov
        lisa.baroni@usdoj.gov

MATTHEW L. SCHWARTZ
LISA A. BARONI
Assistant United States Attorneys
   - Of Counsel -

The United States of America (the "Government"), by and through its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum in advance of the sentencing of the defendant in the above-captioned case, presently scheduled for May 6, 2013.

## PRELIMINARY STATEMENT

For literally decades, the defendant held himself out as another man: Ricardo Hernandez. And since at least 2001, the defendant used Mr. Hernandez's name and pedigree to establish his own identity and citizenship in order to obtain tens of thousands of dollars in federal and other benefits. In doing so, he victimized and defrauded not only Mr. Hernandez, but also the United States (at least through the Social Security Administration, the Department of Agriculture, the Department of Veterans Affairs, and the Department of State), the City of New York (through its Human Resources Administration), and others, including, for example, Washington Mutual Bank and Banco Popular. He is a defendant for whom a meaningful term of imprisonment should be imposed, consistent with a Guidelines range of 66 to 72 months' imprisonment.

## BACKGROUND

**A.    The Misappropriation of Ricardo Hernandez's Identity, and the Defendant's Use of it For His Own Gain**[1]

Ricardo Hernandez was born at Bellevue Hospital in Manhattan, on August 7, 1952, to Mauro Hernandez and Candida Padilla.  As Mr. Hernandez testified, he was raised by his mother, alone, both in Newark and Puerto Rico.  Mr. Hernandez only discovered who has father was when, on May 27, 1970, he joined the Navy and, before he was shipped out to serve in Vietnam, his mother provided him with a copy of his birth certificate — which he has kept to this day, (GX 54).  As was the practice at that time, Mr. Hernandez was assigned a social security number when he turned 16 and wanted to work; he likewise kept a copy of his original social security card, (GX 56).

Other than the defendant himself, no one apparently knows who the defendant is.  The best evidence appears to be that he is from El Salvador, (*see* PSR ¶¶ 74-75 (defendant told MCC psychiatric evaluator and police officer in New Jersey that he was born in El Salvador); *see also* GX 10 (defendant in possession of business card from the Salvadorian consulate)), although he has at other times claimed to have been born in the Dominican Republic and the United States.

---

[1]    The facts in this section are drawn from the defendant's Presentence Investigation Report ("PSR"), and the testimony and exhibits introduced at trial.  Because the Court presided over the trial in this case and is familiar with the relevant facts, and because the facts — as opposed to the defendant's mental state — were never disputed by the defendant, we have generally not provided record citations in this memorandum.  We can, of course, do so if it would be helpful to the Court.

But whoever he is, on May 1, 1983, the defendant applied for a Social Security card in Mr. Hernandez's name, (GX 1-2). Between approximately that time and his arrest (and even today), the defendant has largely assumed the identity of Ricardo Hernandez. Among other things, he obtained a birth certificate from the City of New York and several Social Security cards, and he opened a bank account at Banco Popular; when he was arrested, the defendant was in possession of no fewer than 13 pieces of identification in Mr. Hernandez's name, (GX 10).

The defendant also used Mr. Hernandez's identity to get money and other benefits. He received at least $64,255.44 in food stamps, cash assistance, and medical benefits from the New York City Human Resources Administration (funded by the U.S. Department of Agriculture), and at least $8,371.00 in Social Security benefits, (PSR ¶ 29).[2] He also — at least for a brief period of time — successfully took over the real Ricardo Hernandez's bank account at Washington Mutual, changing the address on the account from Mr. Hernandez's home in Florida to his own apartment, in Manhattan, (GX 14). As recounted in the PSR, the defendant

---

[2]   For the SSA's losses: *see* Trial Tr. at 173 (testimony of SSA Special Agent Anthony Patlaba: "The total overpayment was $8,371. However, a check was recouped. So that the outstanding balance was $7,686.10.") GX 2-7 (SSA Overpayment Detail).

For HRA's losses: *see* Trial Tr. at 196 (testimony of HRA Investigator Sarah Zaveloff: "He received $11,505.06 in food stamps and $7,946.22 in cash."); GX 70-21 (reflecting $11,611.18 in food stamps payments and $7,946.22 in cash assistance payments); GX 70-18 (reflecting $30,587.25 in HRA payments to medical providers and $17,110.79 in HRA payments for pharmaceuticals); *cf.* Trial Tr. at 187 (Investigator Zaveloff explaining that HRA "provide[s] food stamps, cash, and medical assistance").

victimized Mr. Hernandez in other ways, as well, including — since 1984 — interfering with Mr. Hernandez's ability to file tax returns, (PSR ¶ 24), and also making Mr. Hernandez the target of various bill collection efforts aimed at the defendant, thereby "wreck[ing] havoc on the victim's credit history," (PSR ¶¶ 26, 28).  Mr. Hernandez also had difficulty getting employment in the security field — despite his lengthy Navy service, including eight years as a security base patrolman — because background checks revealed the defendant's criminal history, (PSR ¶ 27).

In late 2009, the defendant attempted to obtain a U.S. passport in Ricardo Hernandez's name.  The State Department realized that the real Mr. Hernandez already had a passport, and so initiated the investigation that led to the defendant's arrest.  (PSR ¶¶ 10-22).

B.   **The Defendant's Arrest, Indictment, and Conviction**

On or about October 19, 2010, the defendant was arrested and charged by complaint with passport fraud.  On or about May 2, 2011, a grand jury sitting in this district returned a superseding indictment charging the defendant in six counts with passport fraud, in violation of 18 U.S.C. § 1542; food stamp fraud, in violation of 18 U.S.C. § 1001(a)(2); social security fraud, in violation of 42 U.S.C. § 1383a(a)(1); and three corresponding counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

Trial commenced on December 4, 2012.  Among other things, the Government introduced testimony from the real Ricardo Hernandez; from a Diplomatic Security

4

Services Special Agent who arrested the defendant and took his statement; from the man who lived at the apartment that the defendant had listed as his address, but who had never seen the defendant before; and from officials from the State Department, the Social Security Administration, and the Human Resources Administration. On December 7, 2012, after brief deliberations, a jury convicted the defendant of all six counts of the Superseding Indictment.

**D.    The Presentence Report**

On April 4, 2013, the Probation Office submitted its Presentence Report, which contained its calculation of the application of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") to the defendant's offense. (PSR ¶¶ 32-57). The PSR calculates the Guidelines as follows:

1. The sentencing guideline applicable to the offense charged in Count One (Passport Fraud) is U.S.S.G. § 2L2.2. (PSR ¶ 36) Pursuant to U.S.S.G. § 2L2.2(a), the base offense level is 8. (PSR ¶ 41).

2. Pursuant to U.S.S.G. § 3D1.2, Counts Three and Five are grouped together. (PSR ¶ 34). The Guideline applicable to this group of offenses is U.S.S.G. § 2B1.1. (*Id.*).

    a. Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is 6. (PSR ¶ 42)

    b. Because the offenses in Counts Three and Five involve losses of more than $70,000, but less than $120,000, the base offense level is increased by 8 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(E). (PSR ¶ 43).

    c. The adjusted offense level for the offenses charged in Counts Three and Five is therefore 14. (PSR ¶ 47).

        3.      Pursuant to U.S.S.G. § 3D1.2, the offense charged in Count One ("Group One") comprises a separate Group from the offenses charged in Counts Three and Five ("Group Two"). Pursuant to U.S.S.G. § 3D1.4, the combined offense level is determined by taking the offense level applicable to the Group with the highest offense level (*i.e.*, Group Two, with an offense level of 14) and increasing it by 1 level because there are a total of 1½ units. (PSR ¶¶ 48-50). Specifically, Group One counts as a half-unit because that Group is 5 to 8 levels less serious than Group Two. *See* U.S.S.G. § 3D1.4(b).

The total offense level for Groups One and Two is therefore 15, resulting in a sentencing range of 18 to 24 months' imprisonment. (PSR ¶¶ 57, 95).[3]

In addition, Counts Two, Four, and Six charge violation of 18 U.S.C. § 1028A. The sentencing guideline applicable to those Counts is U.S.S.G. § 2B1.6. (PSR ¶¶ 95-96). Pursuant to that section, "the guideline sentence is the term of imprisonment required by statute," *i.e.*, two years' imprisonment, to run consecutively with the sentence imposed on the remaining counts. Depending on whether those counts are made to run consecutively or concurrently (a topic on which the PSR expresses no opinion as a matter of law, and which is discussed further below), the aggregate Guidelines range for all of the counts of conviction is, according to the PSR, 42 to 96 months' imprisonment. (PSR ¶ 96).

---

[3]     Although the defendant has a conviction for attempted arson and many prior arrests — including for aggravated assault and receiving stolen property — he is in Criminal History Category I. (PSR ¶¶ 59-71).

## DISCUSSION

### A. The Appropriate Guidelines Range is 66 to 72 Months' Imprisonment

#### 1. The PSR Correctly Grouped Counts Three and Five, But Not Count One, Together

In his sentencing memorandum, the defendant objects to the grouping analysis employed in the PSR, arguing that Counts One, Three, and Five should all be grouped together because they "involved the same victim – Ricardo Hernandez." (Def. Mem. at 2). That is incorrect. Ricardo Hernandez was certainly the victim of the aggravated identity theft offense charged in Counts Two, Four, and Six. But the substantive fraud/false statements offenses charged in Counts One, Three, and Five have additional, different victims. The victim of Count One, the passport fraud count, is the United States Department of State, which issues United States passports. The victim of Count Three, the food stamps fraud count, is the New York City Human Resources Administration (and indirectly, the United States Department of Agriculture), which paid out more than $64,000 in food stamps and other benefits on the basis of the defendant's fraud. And the victim of Count Five is the Social Security Administration, which paid out more than $8,000 in SSI benefits, also on the basis of the defendant's fraud.

The Government agrees that grouping Counts Three and Five is appropriate — but not because they have the same victim. Rather, grouping those counts is appropriate under U.S.S.G. § 3D1.2(d), because "the offense level is determined largely on the basis of the total amount of harm or loss . . . or some other measure of

7

aggregate harm." That section specifically lists offenses referenced to section 2B1.1 of the Guidelines — the theft/fraud Guideline that controls Counts Three and Five — as "to be grouped under this subsection." Section 2L2.2 — the Guideline that controls Count One — is listed as one that is "[s]pecifically excluded from the operation of this subsection." Accordingly, the Government agrees with the PSR's grouping analysis of these counts.

### 2.     Of the Three Aggravated Identity Theft Counts, Two Should Run Consecutively To One Another

The defendant also argues that the three aggravated identity theft counts — which each carry a two-year mandatory minimum sentence — should run concurrently with one another. The Guidelines commentary provides that multiple section 1028A counts "may, in the discretion of the court, run concurrently, in whole or in part, with each other." U.S.S.G. § 2B1.6, n. 1(B); *see also* 18 U.S.C. § 1028A(b)(4). The Guidelines then provides a short, non-exhaustive list of relevant factors, including "the nature and seriousness of the underlying offenses," and "whether the underlying offenses are groupable." U.S.S.G. § 5G1.2, n. 2(B). *See also United States v. Lee*, 545 F.3d 678 (8th Cir. 2008) (affirming imposition of multiple section 1028A counts consecutively because district court had adequately considered the factors in the Guidelines commentary).

Applying these standards, and on the facts of this case, the Government believes that the three section 1028A convictions should be structured in some way to run for a total of 48 months, consecutive to the other counts of conviction. This

can be arranged in any number of ways, the most logical of which is to run Count Two (relating to the Passport Fraud) consecutively to Counts Four and Six (relating to the social security and food stamps frauds), which should run concurrently with one another.

The rationale for arranging the section 1028A counts in this fashion is that, first, it reflects the grouping analysis for the underlying crimes discussed above. Running some, but not all, of the section 1028A counts consecutively also reflects the severity of the underlying offenses — which, as discussed above, involved entirely misappropriating Ricardo Hernandez's identity for nearly 30 years.  (Of course, even if the Court runs all three section 1028A counts consecutively, it still has the discretion to impose a higher sentence through consideration of the statutory sentencing factors, 18 U.S.C. § 3553).

### 3. The Defendant Is Not Entitled to a Downward Departure

The defendant also argues that he should receive a downward departure because of his mental illness.  The Guidelines provide that a departure based on mental or emotional conditions may be appropriate, "if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3.

The most recent evaluation of the defendant (*i.e.*, not the report attached to the defendant's sentencing submission, but rather the subsequent report conducted at the Federal Medical Center) indicates that the defendant's primary psychiatric

9

diagnosis is schizophrenia, undifferentiated type.  The evaluation notes that the defendant's "prognosis is fair. . . . [H]is psychotic symptoms have responded well to antipsychotic medication.  Currently his mental status is stable.  Furthermore, he currently voices his belief that he has Schizophrenia and reports that medication makes him feel better, thus demonstrating some insight into his illness."  The report notes, however, that the defendant does have a history of not taking his medication, which is compounded by his alcoholism.

Having a mental illness that is treatable with medication, such that the defendant's "prognosis is fair," is not a mental condition "present to an unusual degree [that] distinguish[es] the case from the typical cases covered by the Guidelines."  The defendant therefore should not receive a downward departure on this basis.  That said, the Government does not dispute that the defendant has a history of mental illness, and believes those circumstances can be adequately considered by the Court in the context of analyzing the sentencing factors under Section 3553(a).

**B.    The Defendant Should Be Sentenced to a Meaningful Term of Imprisonment, Consistent With the Sentencing Guidelines Range**

A criminal sentence must be crafted to adequately reflect, among other things, the seriousness of the offense, the need for respect for the law, and the need to punish the offense and deter future criminal conduct.  *See* 18 U.S.C. § 3553(a)(2).  Based on the Guidelines calculations set out in the PSR, the applicable Guidelines range is 42 to 96 months' imprisonment.  In the Government's view, the Court

10

should find the Guidelines range to be narrower: 66 to 72 months' imprisonment.

Although the Guidelines are of course no longer mandatory, the Supreme Court has made clear that a sentencing court should "consult" the Guidelines and "take them into account" when sentencing. *United States v. Booker*, 543 U.S. 220, 264 (2005). The Court has recently reaffirmed that the Sentencing Commission "continues to fill an important institutional role because it has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise. Accordingly, we have instructed that district courts must still give respectful consideration to the now-advisory Guidelines (and their accompanying policy statements)." *Pepper v. United States*, — U.S. —, 131 S.Ct. 1229, 1247 (2011) (internal quotation marks, citations, and alterations omitted). Indeed, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("Even after *Gall* and *Kimbrough*, sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a 'body of casual advice.'" (quoting *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005))).

Here, an appropriate sentence should include a meaningful term of imprisonment. First and foremost, a sentence to a meaningful term of imprisonment is necessary to reflect the seriousness of the defendant's offenses.

11

Over a period of decades, he misappropriated Ricardo Hernandez's identity for his own benefit (financial and otherwise), and in so doing victimized Mr. Hernandez as well as various governmental agencies, banks, hospitals, and others. Moreover, the defendant has failed to so much as acknowledge his crimes. He refused to participate in an interview with the Probation Office, (PSR ¶ 72), and in both of his psychological interviews, he insisted that he was Ricardo Hernandez and provided other details of Mr. Hernandez's identity — such as the identity of his parents — as his own.

      One can only speculate about the defendant's reasons for continuing to refuse to divulge his true identity. As set forth above, the best evidence is that the defendant is from El Salvador, so his refusal to identity himself may fairly be inferred to be to frustrate the immigration laws and to obtain benefits available only to United States citizens. Of course, the Courts knows too well that in *United States v. Doe*, the Second Circuit reversed this Court's imposition of a ten-year, statutory maximum sentence on a defendant convicted of a passport fraud charge who failed to identify himself. 128 Fed. Appx. 179 (2d Cir. 2005). But in doing so, the Second Circuit noted that that defendant's failure to identify himself was "vexing and . . . potentially obstructive of the administrative process for enforcement of our immigration laws," and strongly suggested that a district court would be within its rights in requiring a defendant to identify himself, absent some legitimately articulated Fifth Amendment concern (which would not include fear of deportation). Moreover, this case is not like *Doe*, insofar as the defendant was not

12

convicted of merely passport fraud, but also two counts of benefits fraud, and the evidence established that the defendant used his assumed identity to commit other frauds, as well, over a sustained period of years.[4]  The Court therefore should consider the defendant's lack of acceptance of responsibility as it evaluates the statutory sentencing factors, particularly the need to promote respect for the law.  A Guidelines sentence is also necessary to deter the defendant's own future criminal conduct; there is little reason to believe that, without a meaningful sentence and having failed to identify himself, he will not continue to use Ricardo Hernandez's identity.

The defendant's crimes were serious ones.  As a result, he is a defendant for whom a sentence to a meaningful term of imprisonment is necessary to afford adequate deterrence generally to criminal conduct, as well as to reflect the seriousness of the offense and provide just punishment.  *See* 18 U.S.C. § 3553(a)(1), (2)(A), (B) and (C).

---

[4] Another difference:  In *Doe*, the pre-*Booker* Guidelines were 6-12 months' imprisonment.  Here, the Guidelines are (in the Government's view, at least), 66 to 72 months' imprisonment, and the statutory maximum for the counts of conviction is 26 years.

## CONCLUSION

For the foregoing reasons, the Court should sentence the defendant to a meaningful term of imprisonment, consistent with a Guidelines range of 66 to 72 months' imprisonment. In addition, the Court should impose an order of restitution, which the Government will provide.

Dated:   May 3, 2013
         New York, New York

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

         By:         /s/
                              MATTHEW L. SCHWARTZ
                              LISA A. BARONI
                              Assistant United States Attorneys
                              One Saint Andrew's Plaza
                              New York, New York 10007
                              Telephone:  (212) 637-1945/2405
                              Facsimile:  (212) 637-2452
                              E-mail:  matthew.schwartz@usdoj.gov
                                       lisa.baroni@usdoj.gov